IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

| | |
|---|---|
| Hannah Robertson, individually and on behalf of her minor child, R.R.S., <br><br> Plaintiffs, <br><br> v. <br><br> Anderson Mill Elementary School, Spartanburg School District #6, and Elizabeth Foster, individually and in her official capacity as principal, <br><br> Defendants. | C/A No. 7:19-668-TMC <br><br> **ORDER** |

In their Amended Complaint, Plaintiff Hannah Robertson ("Robertson"), individually and on behalf of her minor child, R.R.S. ("R.R.S."), (collectively "Plaintiffs") allege a claim pursuant to 42 U.S.C. § 1983 and state law claims of intentional infliction of emotional distress and negligent infliction of emotional distress against Defendants Anderson Mill Elementary School (the "School"), Spartanburg School District #6 (the "District"), and Elizabeth Foster ("Foster"), individually and in her official capacity as principal of the School (collectively "Defendants"). (ECF No. 6).[1] This matter is before the court on two motions: (1) Defendants' motion to dismiss and strike (ECF No. 9); and (2) Plaintiffs' motion for leave to file a Second Amended Complaint (ECF No. 15). These motions have been fully briefed and are now ripe for ruling

**I. Background/Procedural History**

---

[1]Technically, there is only one plaintiff in this action who is suing in two capacities. However, the court refers to the Plaintiffs in the plural because a person suing in different capacities should be considered as if he or she were two distinct persons. *See Goldstein v. Galvin*, 719 F.3d 16, 23 (1st Cir. 2013) (holding that "a person sued in his official capacity is a different party, in contemplation of law, than the same person sued in his individual capacity.").

This past school year, R.R.S. was ten years old and in the fourth grade at the School. (ECF No. 6 at 2). Several weeks prior to the filing of this lawsuit, her teacher gave her class an assignment to write a short essay on any topic addressed "to society." *Id.* Copies of the essays of all the students were to be compiled and sent home with the students. *Id.* at 3. Because R.R.S.'s maternal grandfather is a homosexual, "R.R.S. decided that she wanted her paper to help society learn to treat members of the LGBTQ community equally." *Id. at 2.* About a week prior to the filing of this lawsuit, and after two written drafts, R.R.S. submitted the following essay, quoted verbatim:

> To society, I don't know if you know this but peoples view on Tran's genders is an issue. People think that men should not drees like a women, and saying mean things. They think that they are choosing the wrong thing in life. In the world people can choose who they want to be not being told that THEIR diction is wrong. I hope people understand that people can hurt themselves from others hurting their feelings. People need to think before they speak because one word can hurt someone's feelings. We need to fix this because this is getting out of hand!

*Id.* at 2-3.

After Foster reviewed all of the students' essays, she directed R.R.S.'s teacher to tell R.R.S. that the School would not include her essay because it was not on an appropriate topic. *Id.* at 3. R.R.S. revised the essay, and she thereafter submitted the following essay about bullying, quoted verbatim:

> To society, I don't know if you know this but peoples view on bullying is an issue. People think that saying mean things is ok and saying mean things. They think that they are choosing the wrong thing in life. In the world people can choose who they want to be not being told that THEIR diction is wrong. I hope people understand that people can hurt themselves from others hurting their feelings. People need to think before they speak because one word can hurt someone's feelings. We need to fix this because this is getting out of hand!

*Id.* at 3-4. In their Amended Complaint, Plaintiffs allege that:

> through a series of increasingly abusive, harassing, emotionally distressful and/or

> clearly unwarranted communications with [Robertson], [Foster] religiously defended her decision by consistently raising her voice and making loud statements, including but not limited to the following: that the original paper would "make other parents upset," "would create a undesirable situation at the school," was "not acceptable" and that it was "not age-appropriate to discuss transgenders, lesbians and drag queens outside of the home. [Foster] further proclaimed that "due to the type of school this is, the people that work here and the students and families of the students that go here, the topic would be disagreeable.

*Id.* at 4. Robertson contends that Foster continued to harass her when she mailed two identical letters dated March 15, 2019, despite Robertson's request that Foster stop communicating with her. *Id.* at 4-5.[2] In the letter, Foster indicated that both of R.R.S.'s papers would be included in the compilation. *Id.* at 5. Plaintiffs contend that this decision conflicts with their request that the original paper not be published, and, additionally, they argue that the publishing of both papers would expose R.R.S.'s identity. *Id.*[3] Ultimately, "Foster made arrangements for both essays written by R.R.S. to be published." (ECF No. 23 at 2). However "R.R.S.'s essays were removed at the request of Plaintiff[s]." *Id.*

Plaintiffs filed this action on March 6, 2019, (ECF No. 1), and subsequently on March 20th, filed the Amended Complaint, raising three claims: (1) Violation of First Amendment Right to Freedom of Speech; (2) Intentional Infliction of Emotional Distress; and (3) Negligent Infliction of Emotional Distress. (ECF No. 6). On April 3, 2019, Defendants filed a motion to dismiss and strike. (ECF No. 9). On April 17, 2019, Plaintiffs filed a response opposing the

---

[2] Plaintiffs also state that "[b]ased upon reasonable suspicion, this letter was, at least to some extent, drafted, and mailed by or with assistance of counsel for Defendants. The practical effect of this letter was to circumvent Plaintiffs' attorney and contact Plaintiff Hannah Robertson directly." (ECF No. 6 at 5).

[3] On April 8, 2019, R.R.S. posted a video on Facebook identifying herself, and discussing the incident and this case. (ECF No. 15-1 at 6). This video also received media attention and was reported by local and regional news networks. *Id.*

motion in part (ECF No. 12), and on April 24, 2019, Defendants filed a reply (ECF No.14). On April 24, 2019, Plaintiffs also filed a motion for leave to file a second amended complaint. (ECF No. 15). On May 8, 2019, Defendants filed a response opposing that motion. (ECF No. 16). These motions are now fully briefed and ready to be ruled upon.

## II. Applicable Law

To survive a Rule 12(b)(6) motion, "[f]actual allegations must be enough to raise a right to relief above the speculative level," with the complaint having "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). When considering a motion to dismiss, the court should "accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to survive a motion to dismiss. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).

Rule 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Rule 12(f) motions are generally viewed with disfavor because striking a portion of a pleading is a drastic remedy and because it is often sought by the movant simply as a dilatory tactic." *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 347 (4th Cir. 2001) (omitting internal quotation marks and citation). Rule 12(f)(2) provides that a motion to strike should be filed before responding to the pleading. Fed. R. Civ. P. 12(f)(2). Whether to grant a motion to strike under Rule 12(f) is within the sound discretion of the court. *See GTSI Corp. v. Wildflower Int'l, Inc.*,

No. 1:09CV123, 2009 WL 2160451, at *4 (E.D. Va. July 17, 2009).

### III. Discussion

#### A. Motion to Dismiss and Strike

In their motion to dismiss and strike, Defendants contend that: (1) the School is an improper party because it is not a separate legal entity from the District; (2) Foster is entitled to qualified immunity; (3) Foster is not a proper defendant under the South Carolina Tort Claims Act ("SCTCA"); (4) Plaintiffs' claim for intentional infliction of emotional distress is barred by the SCTCA; (5) there is no cause of action for the negligent infliction of emotional distress in South Carolina; (6) Plaintiffs have not shown an irreparable harm or that they do not have adequate remedies at law to warrant an injunction; and (7) the SCTCA precludes the recovery of punitive damages. (ECF No. 9 at 1-2). In their response, Plaintiffs agree that: (1) the School is not a proper party and should be dismissed; (2) the District is immune from the intentional infliction of emotional distress pursuant to the SCTCA; and (3) the SCTCA does not provide for punitive damages. (ECF No. 12 at 1, 4, 17). Moreover, Plaintiffs also state they will seek to file a second amended complaint to address some of the deficiencies which Defendants raise in regard to the negligent infliction of emotional distress claim. *Id.* at 2-3. Otherwise, Plaintiffs contend that the court should deny the motion to dismiss and strike. *Id.* at 17. The court addresses the remaining issues still in dispute below.

#### 1. Federal Claim

#### a. Qualified Immunity

Pursuant to § 1983, Plaintiffs allege Defendants violated R.R.S.'s First Amendment right to free speech. (ECF No. 6 at 6-7). In their motion to dismiss, Defendants contend that they are entitled to qualified immunity because Plaintiffs have failed to state a claim for a violation of

5

R.R.S.'s free speech rights. (ECF No. 9-1 at 5). Further, they argue that, even if the court were to find that Plaintiffs have sufficiently stated such a claim, the constitutional rights claimed by Plaintiffs were not clearly established at the time. *Id.* at 9. In response, Plaintiffs state that the factual allegations in the Amended Complaint easily establish that R.R.S.'s free speech rights were violated and there was "clearly enough pre-existing law" to establish R.R.S.'s rights at the time. (ECF No. 12 at 5).

Government officials are entitled to qualified immunity when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818. The qualified immunity defense must be resolved "at the earliest possible stage of litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (citing *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)). Qualified immunity protects government officials from civil liability and suit for "conduct [that] does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Qualified immunity protects law enforcement officers from "bad guesses in gray areas" and ensures that they are liable only "for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992).

Qualified immunity may only be invoked by a government official sued in his personal, or individual, capacity. *See Kentucky v. Graham*, 473 U.S. 159, 165-67 (1985). It is not available in an official-capacity suit brought against a government entity or a government officer in his official capacity as that entity's agent. *Id.* Moreover, qualified immunity applies to claims for monetary relief against officials in their individual capacities, but is not a defense against

claims for declaratory or injunctive relief. *Wall v. Wade*, 741 F.3d 492, 498 n.9 (4th Cir. 2014).

In addressing qualified immunity, the Supreme Court has formulated a two-prong test. *Wilson v. Layne*, 526 U.S. 603, 609 (1999). First, the court must determine "whether the plaintiff has alleged the deprivation of an actual constitutional right at all." *Id.* (quoting *Conn v. Gabbert*, 526 U.S. 286, 290 (1999)). Second, the court must "whether that right was clearly established at the time." *Id.* With respect to the second step, "[t]he relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was lawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). A court has discretion to decide which step of the two-prong test to analyze first. *Pearson*, 555 U.S. at 242. The answers to both prongs must be in the affirmative for a plaintiff to defeat a motion to dismiss or for summary judgment based on qualified immunity grounds. *See Batten v. Gomez*, 324 F.3d 288, 293-94 (4th Cir. 2003). The plaintiff bears the burden of proof on the first prong, *Bryant v. Muth*, 994 F.2d 1082, 1086 (4th Cir. 1993), and the defendant bears the burden on the second prong, *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003).

Accordingly, the court must first determine whether Defendant Foster violated R.R.S.'s First Amendment right to free speech. If the court finds a violation, the court must then determine whether it was clearly established at the time that Foster's actions would violate R.R.S.'s right to free speech.

**I. Violation of Right to Free Speech**

The First Amendment bars the government from "abridging the freedom of speech," U.S. Const. amend. I.[4] The extent to which the government may regulate an individual's speech

---

[4] "[T]he Fourteenth Amendment makes the First Amendment's Free Speech Clause applicable against the States . . ." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S.Ct. 1921, 1928 (2019).

7

without violating his First Amendment rights depends on what kind of government property - or forum - in which the individual wishes to express himself.  *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44-46 (1983).  In order to preserve this freedom, government entities are strictly limited in their ability to regulate private speech in "traditional public fora." *Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 U.S. 788, 800 (1985).  Reasonable time, place, and manner restrictions are allowed, *Perry Ed. Assn.*, 460 U.S. at 46, but any restriction based on the content of the speech must satisfy strict scrutiny; that is, the restriction must be narrowly tailored to serve a compelling government interest, *Cornelius*, 473 U.S. at 800, and restrictions based on viewpoint are prohibited, *Carey v. Brown*, 447 U.S. 455, 463 (1980).

"[A]s [the Fourth Circuit] and other courts have recognized, First Amendment parameters may be especially difficult to discern in the school context." *Abbott v. Pastides*, 900 F.3d 160, 174 (4th Cir 2018).  While students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gates," *Tinker v. Des Moines Independent Community School  District*, 393 U.S. 503, 506 (1969), "the constitutional rights of students in public school are not automatically coextensive with the rights of adults in other settings," *Bethel School District No. 403 v. Fraser*, 478 U.S. 675, 682 (1986).

Since *Tinker*, the Supreme Court has set forth several exceptions to the right to free speech in schools.  First, in *Fraser*, the Court held that schools may ban speech if it is lewd, vulgar, indecent, or plainly offensive.  478 U.S. 675.  Thereafter, in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260 (1988), the Court determined that a school could  suppress certain speech when it bore the school's imprimatur or was considered school-sponsored speech and the restriction was reasonably related to a legitimate pedagogical reason.  More recently, in *Morse v. Frederick*, 551 U.S. 393 (2007), the Court held that schools may categorically prohibit speech

8

that can reasonably be regarded as encouraging illegal conduct, such a drug use.

If the expression was private expression that just happened to occur at school, courts look to *Tinker*, 393 U.S. 509 (noting that private expression may be restricted only if such expression "would substantially interfere with the work of the school or impinge upon the rights of other students"). However, in situations like here, where the assignment is "fairly . . . characterized as part of the . . . curriculum," schools are afforded greater latitude to restrict the speech as set forth in *Hazelwood*, 484 U.S. at 271. In these situations, "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to legitimate pedagogical concerns." *Id.* at 273. "The determination of what manner of [student] speech in the classroom or in school assembly is inappropriate properly rests with the school board, rather than with the federal courts." *Id.* at 266.

In *Hazelwood*, three high school students on the school's newspaper staff brought an action alleging that their freedom of speech rights were violated by the high school's decision to delete two articles from a school newspaper. *Id.* at 262. The two articles described students' experiences with pregnancy and the impact of divorce on students at the school. *Id.* at 263. Although the students used aliases in the pregnancy story, the principal was concerned that the girls could still be identified from the text and that their privacy rights would be violated. *Id.* In the article about divorce, a particular student was identified by name, and the article contained negative statements concerning the parents. *Id.* The Supreme Court held that the students' First Amendment rights were not violated. *Id.* at 272. The Court rejected the students' argument that the school newspaper constituted a public forum and instead found the school newspaper was a school-sponsored program and required a different analysis than the one espoused in *Tinker*. *Id.*

at 272-73. The Court held that "educators do not offend the First Amendment by exercising editorial control over the style and content of student speech in school-sponsored expressive activities so long as their actions are reasonably related to pedagogical concerns." *Id.* at 271-72.

Here, Plaintiffs agree that, under *Hazelwood*, a school's restrictions of school-sponsored speech are not unconstitutional if they are reasonably related to legitimate pedagogical concerns, but they argue that, even under *Hazelwood*, any restriction must be viewpoint-neutral. (ECF No. 12 at 6).[5] They contend, however, that Foster had no legitimate educational concerns and that her restriction of R.R.S.'s speech was content and viewpoint based discrimination. *Id.* at 6-8. Specifically, citing *Hazelwood*, 484 U.S. at 271, Plaintiffs argue that the material was not "ungrammatical, poorly written, inadequately researched, biased or prejudiced, vulgar or profane, or unsuitable for immature audiences." (ECF No. 12 at 7). Defendants argue that Foster restricted the first essay based on her belief that the topic was not appropriate for fourth graders and not based on its viewpoint and that such content based restrictions are not unconstitutional under *Hazelwood*. (ECF No. 9-1 at 8). Further, Defendants contend that, even if the court were to hold that *Hazelwood* requires viewpoint neutrality and the court were to find that Foster's restriction was viewpoint-based, Foster is entitled to qualified immunity because the law was not clearly established, as the circuits are split as to whether *Hazelwood* requires viewpoint neutrality. *Id.* at 9-10; ECF No. 14 at 1.

Viewpoint discrimination is a form of content discrimination where the government

---

[5]The court notes that Plaintiffs make these arguments in regard to the second prong of the qualified immunity analysis. In regard to the first prong, Plaintiffs merely argue that "the first condition is easily satisfied by the factual/legal allegations of First Amendment violations against R.R.S. present in the Amended Complaint." (ECF No. 12 at 5). Plaintiffs then move on to discuss whether the right was clearly established and whether Hazelwood required viewpoint neutrality. *Id.* The court, however, finds that analysis of either prong must include a discussion of whether viewpoint neutrality is required under *Hazelwood.*

10

targets particular views on a given subject. Viewpoint neutrality forbids the government from regulating speech in ways that favor some viewpoints or ideas over others. *See Lamb's Chapel v. Center Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993). However, there is no viewpoint discrimination where a topic is categorically excluded from the forum regardless of the particular stance the speaker takes. *Id.*

As Defendants point out (ECF No. 9-1 at 9-10), there is no Supreme Court or Fourth Circuit precedent on whether *Hazelwood* permits schools to restrict speech based on its viewpoint, and the other circuits are split. The Second, Ninth, and Eleventh Circuits have held that viewpoint neutrality is required under *Hazelwood*. *See Peck ex rel. Peck v. Baldwinsville Cent. Sch. Dist.*, 426 F.3d 617, 632-33 & n.9 (2d Cir. 2005); *Searcey v. Harris*, 888 F.2d 1314, 1319 n.7 (11th Cir. 1989). However, the First and Tenth Circuits have held that viewpoint neutrality is not required under *Hazelwood*. *See Fleming v. Jefferson Cty. Sch. Dist.*, 298 F.3d 918, 926-28 (10th Cir. 2002); *Ward v. Hickey*, 996 F.2d 448, 452 (1st Cir. 1993).[6]

In *Hazelwood*, although the Court did not specifically mention viewpoint neutrality, the Court suggested that viewpoint neutrality is not required by stating that: "[a] school must also retain the authority to refuse to sponsor student speech that might reasonably be perceived to advocate drug or alcohol use, irresponsible sex, or conduct otherwise inconsistent with the shared values of a civilized social order, or to associate the school with any position other than neutrality on matters of political controversy." *Hazelwood*, 484 U.S. at 272 (internal citation and

---

[6]A Third Circuit panel held that viewpoint neutrality is not required because "a viewpoint-based restriction . . . may be reasonably related to legitimate pedagogical concerns," *C.H. ex rel. Z.H. v. Oliva*, 195 F.3d 167, 172 (3d Cir. 1999), but the en banc court vacated that holding, 197 F.3d 63 (3d Cir. 1999), and affirmed on other grounds without reaching the viewpoint neutrality issue, 226 F.3d 198 (3d Cir. 2000).

quotation marks omitted). As the Tenth Circuit has reasoned, *Hazelwood's* "specific reasons supporting greater control over school-sponsored speech, such as determining the appropriateness of the message, the sensitivity of the issue, and with which messages a school chooses to associate itself will often turn on viewpoint-based judgments." *Fleming*, 298 F.3d at 928.

Additionally, the court notes that the Seventh Circuit has expressed doubt as to whether elementary age students have any free speech rights within the school setting. *Muller by Muller v. Jefferson Lighthouse Sch.*, 98 F.3d 1530, 1538-39 (7th Cir. 1996) (finding that "[i]t is unlikely that *Tinker* and its progeny apply to public elementary (or preschool) students."); *see also Nuxoll ex rel. Nuxoll v. Indian Prairie Sch. Dist. # 204*, 523 F.3d 668, 673 (7th Cir. 2008) (relying on *Muller*, 98 F.3d at 1538-39, for the proposition that when a school regulates the speech of children that are "very young . . . the school has a pretty free hand."). Furthermore, "a school must be able to take into account the emotional maturity of the intended audience . . . ." *Hazelwood*, 484 U.S. at 272. "The 'marketplace of ideas,' an important theme in the high school student expression cases, is a less appropriate description of an elementary school, where children are just beginning to acquire the means of expression." *Morgan v. Swanson*, 659 F.3d 359, 378 (5th Cir. 2011) (citing *Muller*, 98 F.3d at 1538). "The number of everyday decisions that must be made with respect to the boundaries of acceptable behavior of third graders is so great that courts cannot second guess elementary school officials on every minor dispute involving third graders' expression." *Walker-Serrano v. Leonard*, 325 F.3d 412, 419 (3d Cir. 2003).

The court agrees with the courts which have held that viewpoint neutrality is not required by *Hazelwood*. Applying the *Hazelwood* standard to the facts of this case, and accepting as true

the allegations in the Amended Complaint, the court finds that Plaintiffs cannot show a violation of R.R.S.'s First Amendment rights.  As noted above, in their Amended Complaint, Plaintiffs allege Foster told them that:

> the original paper would "make other parents upset," "would create a undesirable situation at the school," was "not acceptable" and that it was "not age-appropriate to discuss transgenders, lesbians and drag queens outside of the home. [Foster] further proclaimed that "due to the type of school this is, the people that work here and the students and families of the students that go here, the topic would be disagreeable."

(ECF No. 6 at 4).  "It is only when the decision to censor a school-sponsored . . . vehicle of student expression has no valid educational purpose that the First Amendment is so directly and sharply implicated as to require judicial intervention to protect students' constitutional rights." *Hazelwood*, 484 U.S. at 273 (citations, internal quotation marks and brackets omitted).  That was not the case here.  The court finds Foster had a legitimate pedagogical reason for restricting R.R.S.'s speech.

Moreover, even if the court were to agree with the circuits that require viewpoint neutrality, there is no indication that Foster was motivated by a disagreement with the view expressed by R.R.S. in the essay.  Plaintiffs contend that Foster's statements about why she decided to not publish R.R.S.'s first essay, her tone of delivery, and the implied bigotry underlying these statements amount to content and viewpoint-based restrictions. (ECF No. 12 at 7-8).  However, the court finds that Foster's statements amount to nothing more than her view that the topic of transgenders would be inappropriate for fourth graders.  Whether that view is correct or not is not for this court to decide.  "Although schoolteachers provide more than academic knowledge to their students, it is not a court's obligation to determine which messages of social or moral values are appropriate in a classroom. Instead, it is the school board, whose

13

responsibility includes the well-being of the students, that must make such determinations." *Lee v. York Cty. Sch. Div.*, 484 F.3d 687, 700 (4th Cir. 2007). "[T]he education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local officials, and not of federal judges." *Hazelwood*, 484 U.S. at 273. Accordingly, the court finds that Plaintiffs have not established the deprivation of an actual constitutional right, and, therefore, Foster is entitled to qualified immunity.

### ii. Clearly Established Right

Alternatively, because the law is not clearly established as to whether the First Amendment prohibits viewpoint discrimination in the context of school-sponsored speech, Foster argues she is entitled to qualified immunity. (ECF No. 9-1 at 9-10). The court agrees. In response, Plaintiffs argue that there is clearly enough pre-existing law that would have placed Foster on notice that she was violating R.R.S.'s First Amendment rights when she decided not to publish R.R.S.'s essay based on the content and viewpoint of the message. (ECF No. 12 at 6). Further, Plaintiffs contend that the essay contained no sexual undertones or messages that may reasonably be considered unsuitable for a fourth grade audience, and, therefore, Foster could not have had legitimate educational concerns. *Id.* at 7.

The Fourth Circuit has "long held that it is case law from this Circuit and the Supreme Court that provide notice of whether a right is clearly established." *Hill v. Crum*, 727 F.3d 312, 322 (4th Cir. ) (citing *Lefemine v. Wideman*, 672 F.3d 292, 298 (4th Cir. 2012), vacated on other grounds, ___ U.S. ___, 133 S.Ct. 9 (2012)). Moreover, "[w]hile a consensus of cases of persuasive authority may clearly establish a right for qualified immunity purposes, the inverse is also true: if there are no cases of controlling authority in the jurisdiction in question, and if other appellate federal courts have split on the question of whether an asserted right exists, the right

cannot be clearly established for qualified immunity purposes. *Rogers v. Pendleton*, 249 F.3d 279, 287-88 (4th Cir. 2001) (citing *Wilson*, 526 U.S. at 618 for the proposition that "[i]f judges . . . disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy.")); *see also Santos v. Frederick Cty. Bd. of Comm'rs*, 725 F.3d 451, 469 (4th Cir. 2013). In light of the circuit split, it cannot be said that the constitutional issue in this case is "beyond debate." *Ashcroft v. al-Kidd,* 563 U.S. 731, 741 (2011); *see also Gates v. Khokhar*, 884 F.3d 1290, 1303 (11th Cir. 2018) ("That judges disagree about a constitutional issue is itself evidence that a right is insufficiently clearly established for purposes of denying qualified immunity.") (citing *Wilson*, 526 U.S. at 618). The split of authority only serves to confirm that federal law is not clearly established on this question, and this case plainly presents one of those "gray areas" that the court referred to in *Wilson*. This case appears to be exactly the type of case for which the qualified immunity defense was intended. Therefore, because the law was not clearly established at the time of her actions, Foster is entitled to qualified immunity as to the claims against her in her individual capacity for which Plaintiffs are seeking monetary relief.

### b. Official Capacity Claims Against Foster

As to claims against Foster in her official capacity, the court finds these should also be dismissed. Plaintiffs alleging constitutional injuries may bring suits under § 1983 against municipalities for unconstitutional actions taken by their agents and employees. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Likewise, a plaintiff may bring a § 1983 action against governmental officials in their official or representative capacity. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). These official-capacity suits are "treated as suits against the [municipality]." *Id.* However, municipal liability under Section 1983 does not amount to respondeat superior.

*Monell*, 436 U.S. at 691. An employer or supervisor is not liable for the acts of their employees, absent an official policy or custom which results in illegal action. *Id.* at 694. Plaintiffs have failed to meet this burden as they have not alleged any constitutional violation based on an official policy or custom.

### c. Injunctive and Declaratory Relief

Plaintiffs seek a declaratory judgment that Foster violated R.R.S.'s First Amendment rights, a preliminary and permanent injunction prohibiting Defendants and their agents and employees from violating the First Amendment rights of R.R.S. and other students in the District in the future, and other declaratory and injunctive relief to which Plaintiffs may be entitled. (ECF No. 6 at 9-10).[7] As noted above, qualified immunity applies only to claims for monetary relief against officials in their individual capacities. *Wall*, 741 F.3d at 498 n.9. However, it is not a defense against claims for declaratory or injunctive relief. *Id.*

To the extent that the Amended Complaint requests a judgment declaring that Defendants violated R.R.S.'s constitutional rights, such relief is unavailable. *Trevillyan v. APX Alarm Sec. Sys, Inc.*, No. 2:10-cv-1387-MBS, 2011 WL 11611, *9 (D.S.C. Jan. 3, 2011); *see also Corliss v. O'Brien*, 200 Fed. App'x 80, 84 (3d Cir. 2006) (holding that "[d]eclaratory judgment is inappropriate solely to adjudicate past conduct. Nor is declaratory judgment meant simply to proclaim that one party is liable to another.").

As to Plaintiffs' request for a permanent injunction prohibiting the Defendants from

---

[7]Although Plaintiffs make a general request for preliminary and permanent injunctive relief in the prayer section of their Amended Complaint, they did not file a motion for a preliminary injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Therefore, their request will be construed as a request for permanent, not preliminary, injunctive relief. *Maya v. Illinois Dept. of Corr.*, No.17-cv-0546-NJR, 2017 WL 3491961, at *5 n.1 (S.D. Ill. Aug. 14, 2017).

violating the First and Fourteenth Amendment rights of R.R.S. as well as every current and future student of the School District, the court finds Plaintiffs have failed to state a claim for such relief.

> [A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that she has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010).

Within the context of constitutional violations, "a plaintiff's claimed irreparable harm is 'inseparably linked' to the likelihood of success on the merits." *WV Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009). That is because deprivation of a constitutional right, even for a short period of time, constitutes irreparable harm. *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *see also NAACP v. City of Myrtle Beach*, No. 4:03-1732-25-TLW, 2006 WL 2038257, at *2 (D.S.C. July 20, 2006) (holding that "the courts of this country have consistently held that the violation of a constitutional right constitutes irreparable injury as a matter of law."). However, as discussed above, the court has determined that Defendants did not violate R.R.S.'s First Amendment rights. Because Plaintiffs have failed to clearly show that it would likely prevail on the merits, Plaintiffs cannot show that they would likely suffer irreparable harm. Accordingly, Plaintiffs cannot meet this critical element required for permanent injunctive relief, and, thus, this request for injunctive relief should be dismissed. Based on the foregoing, the court dismisses with prejudice Plaintiff's federal claim.

### 2. State Law Claims

In addition to her federal claim, Plaintiffs allege state law claims of intentional infliction

of emotional distress and negligent infliction of emotional distress. Having dismissed Plaintiffs' federal claim, the court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims. *See* 28 U.S.C. § 1367(c); *Shanaghan v. Cahill*, 58 F.3d 106, 110 (4th Cir. 1995) (holding that district courts have "wide latitude in determining whether or not to retain jurisdiction over state law claims when all federal claims [against a defendant] have been extinguished.").

### B. Motion to File a Second Amended Complaint

Plaintiffs have filed a motion for leave to file a second amended complaint. (ECF No. 15). Plaintiffs state that, in the proposed second amended complaint, they allege the same causes of action as in the first Amended Complaint (ECF No. 6), but also include recent factual developments that occurred on April 11-12, 2019, and additional allegations regarding the negligent infliction of emotional distress claim so as to conform to South Carolina law. (ECF No. 15 at 3, 4). Plaintiffs state that "[t]he new factual allegations provide perhaps the strongest evidence of harassment against Plaintiff and the correction of the requirements to uphold a negligent infliction of emotional distress claim in South Carolina is absolutely necessary for Plaintiffs to have their 'day in court' to prove that they were negligently inflicted with emotional distress." *Id.* at 6. In response, Defendants argue that Plaintiff's motion to amend should be denied as futile. (ECF No. 16). Defendants contend that in the proposed second amend complaint, Plaintiffs still fail to state a claim of negligent infliction of emotional distress. *Id.* at 4. Plaintiffs' amendments go solely to their state law claims. As the court has determined that the federal claim should be dismissed and declines to exercise supplemental jurisdiction, this motion to amend the state law claims is not properly before this court. Accordingly the court denies it as moot.

## IV. Conclusion

Based on the foregoing, the court finds Defendants are entitled to qualified immunity as to Plaintiffs' federal claim. Accordingly, the court **DISMISSES with prejudice** Plaintiffs' federal claim. Additionally, the court declines to exercise jurisdiction over Plaintiffs' state law claims, and, therefore, **DISMISSES without prejudice** Plaintiffs' state law claims. Accordingly, the court **GRANTS** Defendants' motion to dismiss. (ECF No. 9). Additionally, the court **DENIES** as moot Plaintiffs' Motion to Amend. (ECF No. 15).

**IT IS SO ORDERED.**

s/Timothy M. Cain
United States District Judge

Anderson, South Carolina
October 15, 2019